## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

NEETI KOHLI,

        Plaintiff,

v.

(1) McGEE EYE SURGERY CENTER LLC, and
(2) THE GROUP LLC,

        Defendants.

Case No. CIV-17-542-C

**JURY TRIAL DEMANDED**
**ATTORNEY LIEN CLAIMED**

### COMPLAINT

**COMES NOW THE PLAINTIFF,** Neeti Kohli, M.D., and for her causes of action herein alleges and states as follows:

### PARTIES

1. The Plaintiff, Neeti Kohli, M.D., is an adult female of Asian Indian descent residing in Oklahoma County, Oklahoma.

2. The Defendants are: (a) McGee Eye Surgery Center LLC d/b/a/ McGee Eye Surgery Center a/k/a Dean McGee Eye Institute (hereinafter "MESC"), a domestic limited liability company doing business in Oklahoma County, Oklahoma; and (b) The Group LLC, a domestic limited liability company doing business in Oklahoma County, Oklahoma. MESC and The Group LLC are collectively referred to hereinafter as Defendants.

### JURISDICTION AND VENUE

3. Plaintiff's claims are: (1) discrimination based on gender; (2) discrimination based on race; (3) national origin discrimination, and (4) retaliation all in violation of Title VII of the

Civil Rights Act, 42 U.S.C. §§ 200e et seq., 42 U.S.C. § 1981, and Oklahoma's public policy against wrongful discharge as set forth in the Oklahoma Anti-Discrimination Act. Jurisdiction over the federal claims is vested under 28 U.S.C. § 1331. Because the state law claims arise out of the same core facts and form part of the same case or controversy, jurisdiction over those claims is vested under 28 U.S.C. § 1367(a).

4.     All of the actions complained of occurred in Oklahoma County, Oklahoma and the Defendants may be served in that County. Oklahoma County is located within the Western District of the State of Oklahoma and, thus, venue is proper in this Court under 28 U.S.C. § 1391(b).

## STATEMENT OF ALLEGED FACTS

5.   Dr. Neeti Kohli is a female of Asian Indian descent.  She was born in India, and entered the United States in 1993.  She became a U.S. citizen in 2010.  She is a well-qualified, board certified anesthesiologist.  She has many years of valuable experience and has worked in hospitals and educational institutions in India and in the United States.

6.   Dr. Kohli was employed by MESC from 2006 until May 29, 2015, when her employment was wrongfully terminated.  Both MESC and The Group LLC engaged in discriminatory conduct toward Dr. Kohli and both were involved, directly or by support and endorsement, in adverse actions taken against her.

7.   Throughout her employment, Dr. Kohli was conscientious in the performance of her duties and discharged her responsibilities with high integrity and ethical standards, with attention to detail, keeping patient safety and the quality of patient care as a top priority.

8.   Dr. Kohli performed her job in a competent, dedicated, and satisfactory manner throughout her employment.  Dr. Kohli was viewed as a valued member of the team and routinely received compliments and appreciation from her colleagues for her professionalism and assistance.  She offered insight and helpful solutions to any problems that arose at MESC. She also cooperated with the team in an effort to ensure good patient care, fair scheduling, and she was willing to take on more or less cases as needed to help out.  The CEO, Dr. Gregory Skuta stated in an email to Dr. Kohli, "I appreciate you, your skills, and your professionalism and compassion."

9.   After female medical director Dr. Betty Bowers retired in July of 2012, the environment changed drastically.  Dr. James Simonson, a white male, became the medical director,

and Dr. Kohli began observing discrimination and harassing conduct toward doctors and staff.  Defendants knew that Dr. Simonson was a troubled physician who left a prior employer amidst allegations of problems with anger toward colleagues and staff.

10.     Dr. Simonson began implementing harsh workplace policies directed mostly at the female nursing staff and female anesthesiologists.  One of his early emails set forth a standard of taking "No more lunch breaks during a long block or between if the surgeon, patient, and crew are ready." [1]

11.     Pursuant to a verbal agreement, the primary anesthesiologists working at MESC were taking Friday calls in rotation and were being paid extra. On occasion, Dr. Simonson gave Friday call to his friend Dr. Robert Jay Christensen, a white male, and did not let the primary anesthesiologists take the call. Thus, he was taking calls and patients away from the primary anesthesiologists. This hostile act reduced their earning ability as compensation was dependent upon the number of cases done.

12.     Dr. Kohli was taken off the schedule for the entire month of March 2013 for no reason related to her performance or professionalism. The customary scheduling procedure was to write on the calendar the days requested off. Dr. Simonson had recently changed the procedure to require anesthesiologists to write down the days they were working instead of their days off.  Subsequently, Dr. Kohli wrote her requested days off in red on the scheduling calendar.  Dr. Simonson punished her simple mistake by removing her from the calendar for the entire month because she did not write down the days she was working.  Even though she had conveyed the exact same information by writing down

---

[1] A long block could last 6 hours or longer.

the days she wanted off. After taking the matter to Dr. Skuta, Dr. Kohli got some days back.

13.    Dr. Kohli learned that Dr. Simonson was rude and unprofessional to the female nurses. She became aware that once he threw a phone across the operating room that nearly hit a female scrub tech.

14.    Ms. L.W. [2], a nurse, resigned because of the discriminatory conduct she experienced. L.W. reported the conduct to Dana in Human Resources. According to L.W., "I talked to Dana in HR. I don't think she was very interested, but at least I can say I warned them."

15.    Dr. Simonson was particularly harassing one female, Asian Indian anesthesiologist, Dr. E.D.. He prohibited her from ever taking late calls or doing general anesthesia procedures in the future, and he accused her of being a danger to all patients. His accusations were contradicted by the fact that he continued to assign her cases and even a case involving topical anesthesia could develop into a general anesthesia case during a procedure.

16.    He also bullied the female staff and forced them to participate in his unlawful conduct. When Dr. E.D. had a complication during a procedure, Dr. Simonson asked the nurse who was present in the room to write up a complaint about Dr. E.D. regarding the patient's case. The nurse refused. Dr. Simonson then made the charge nurse do the write-up even though the charge nurse was not even in the room.

17.    Dr. Kohli observed Dr. E.D., frequently sobbing in the locker room at MESC.

---

[2] The anesthesiologists and staff members who were subjected to discrimination in the workplace have been identified by their initials in order to preserve their privacy.

18.     When Dr. E.D. asked Dr. Simonson if she could read the write up against her, he said no.
        Instead, he told her to "take the bylaws home, read it, talk to . . . [your] husband and pray
        about it or whatever . . . [you] do." This statement was an example of his condescension
        and hostility toward women and people of different origins.

19.     Dr. Simonson's bullying did not stop there.  Later, Dr. Simonson threatened Dr. E.D.'s
        job.  He told her to be careful who she talked to and what she said.  He called her into an
        administrator's office.  When Dr. E.D. asked to have a representative in the meeting, Dr.
        Simonson said, "if you want to continue to work here you will enter the room and talk to
        us." He accused her of being disruptive and threatened to have her license taken away.

20.     According to Dr. E.D., Dr. Simonson said that all of this was "okayed by his bosses."

21.     Dr. E.D. informed the CEO, Dr. Skuta, that she was being discriminated against.  Dr. E.D.
        asked Dr. Skuta if he was allowing Dr. Simonson to bring his younger friends to replace
        her.  Dr. Skuta did not answer.  She asked Dr. Skuta for "due process" and offered to be
        monitored for two months to show that her work was good. Dr. Skuta denied both
        requests and said he was standing by Dr. Simonson's decision.

22.     Dr. E.D. had worked for the institution for many years.  She was never blamed for being
        disruptive prior to this time.  Dr. E.D. was being harassed because of alleged inefficiency.
        While Dr. Simonson would intentionally leave patients under anesthesia to do other
        tasks.  This was reported multiple times, yet no adverse action was taken against him by
        administrators.  Moreover, Dr. Simonson also had patient related complications, and no
        severe action was taken against him.

23.     Dr. E.D. stated that she thought he was trying to get rid of her.

24.     Dr. E.D.'s fear about being fired was proven correct when, a few months later, with only three days' notice, four of the five anesthesiologists working at MESC were fired, including Dr. E.D.. They were not given any warning, and did not have an opportunity to transition smoothly to another job. Two of them were females above age 60 and of Asian Indian origin. One was a white male above age 60. One female anesthesiologist, Dr. G.W., had already announced that she was retiring in September of the same year. The sudden firing with no transition time, denied Dr. G.W. an opportunity to retire with dignity.

25.     Despite being informed of Dr. Simonson's discriminatory and harassing conduct, the administrative authorities, including CEO, Dr. Skuta, COO, Mr. Matthew Bown, and executive committee members Dr. Michael Siatkowski, Dr. Reagan Bradford, Dr. Donald Stone[3], and Dr. Bradley Farris, continued to support and endorse him without equivocation. They gave him more control over MESC by allowing him to form The Group LLC, and giving The Group LLC an exclusive contract to provide anesthesiology services at MESC.

26.     Dr. Kohli was the only anesthesiologist retained. Dr. Kohli asserts that she was retained due, in part, to her great work and record of cooperation, flexibility, and service. Dr. Kohli also believes, based on Defendants conduct toward her, that Defendants viewed her as weak and thought that they could mistreat her and take advantage of her.

27.     Dr. Kohli's belief about Defendants' attitude toward her was quickly confirmed when they increased their hostile conduct toward her.

_____

[3] Dr. Stone left the institution in 2014.

28.    In an increasingly hostile work environment, Defendants presented Dr. Kohli with an
       unconscionable agreement.

29.    One egregious provision of the agreement required Dr. Kohli not to discuss any of
       Defendants' practices with anyone inside or outside of the organization.

30.    The agreement also required Dr. Kohli to be available at all times, with no defined
       vacation or off time, or risk being fired with only five days' notice.  The agreement
       prohibited Dr. Kohli from signing an agreement to work with any other facility that would
       interfere with the requirement that she always be available for work at MESC. There was
       no provision for time off.

31.    Dr. Kohli expressed concerns, and sought to negotiate the terms of the agreement in
       good faith. Defendants refused to negotiate and threatened to terminate her
       employment unless she signed it as is.   Dr. Kohli continued to demonstrate her
       willingness to compromise and to negotiate the terms of the agreement in good faith.

32.    For example, Defendant's refused to give Dr. Kohli any commitment regarding the
       amount of work she would have even though they required her total commitment to
       them. Dr. Kohli asked Defendants to give her some assurance about the amount of work
       she would have.  She remained flexible, and was willing to take any number of cases,
       even though fairness dictated that she have roughly 16.7% as one of five to six
       anesthesiologists on the team providing anesthesiology services at MESC.  She told
       them, "You can change percentage to any number that you like and I will not negotiate."
       All Dr. Kohli was asking for was the basic respect and fairness that a colleague deserves.

33. Dr. Kohli included her suggested modifications to the contract in a red-lined draft she provided. Not only did Defendants refuse to accept any of the suggested modifications, they changed the contract for the worse. In yet another act of discrimination and harassment, they shortened the notice period to terminate Dr. Kohli without cause from 90 days to 30 days.

34. Subsequently, Defendants gave Dr. Kohli a termination letter signed by Dr. Simonson on behalf of The Group LLC. The Group LLC was newly formed, and had no relationship with Dr. Kohli at that time.

35. Dr. Kohli was the only anesthesiologist to receive a termination letter. She was the only female, and the only Asian Indian anesthesiologist working at MESC.

36. Because the termination letter could have a damaging impact on her career, two days later, Dr. Kohli sent an email giving in to Defendants' demand that she be would available to work with no assurance of receiving any number of cases. A few minutes later, Dr. Kohli followed up with a text to Dr. Christensen. Defendants responded in 13 minutes, stating "we would love to keep you around." Of note, Dr. Kohli received the termination letter from The Group LLC just 48 hours before this communication.

37. Dr. Kohli wanted all clauses that restricted her ability to discuss the harassing agreement with anyone removed. When they gave her the revised agreement, the clause was still there. When Dr. Kohli refused to sign, Dr. Simonson, Dr. Christensen, and Dr. Miller all wanted her to continue working because she was a good employee. Dr. Simonson sent Dr. Kohli and email stating "I think you are overthinking this. We want you to work."

38.    Eventually, Defendants removed that single clause, and Dr. Kohli signed the agreement. In doing so, she revoked her termination letter, but acquiesced to receiving unfair treatment and allowing them to deny her a proportionate number of cases as she was previously promised.

39.    It is important to note, that throughout this time, Defendants continued to rely on Dr. Kohli's services.   Even after she signed the agreement with The Group LLC, the conditions of her employment with MESC did not change in any respect.  She was still paid by MESC as before for certain services, and was never compensated by The Group LLC.  She continued to work in a discriminatory, hostile, and unfair environment without any support or protection against harassment.

40.    Despite the treatment she endured, Dr. Kohli maintained high ethical and professional standards.  She also opposed unlawful conduct in the workplace.

41.    In order to make more money, Defendants failed to maintain standards of patient care and implemented practices and policies adverse to the public interest in health and safety.  Defendant routinely assigned a single anesthesiologist to cover an inordinate number of cases and multiple operating rooms.  Defendants intentionally failed to schedule enough anesthesiologists to cover the operating rooms because, according to Dr. James Simonson, "that's how you make $ at this place."

42.    MESC and The Group LLC supported unlawful conduct by implementing and/or approving new procedures that allowed them to earn more money at the expense of patient care. For example, instead of seeing and evaluating patients in the pre-operative waiting area, a new policy allowed anesthesiologists to see patients for the first time in

the operating room, at a time when it is difficult (a) to do a thorough preoperative

assessment[4], and (b) to cancel a procedure. The policy engendered a habit of suboptimal

preoperative evaluation of patients.

43.    Many patients were in older age groups and had multiple medical problems, so, although

eye surgery is considered as low risk, at MESC it was imperative to do a thorough

preoperative evaluation.  After the new policy was implemented, four patients suffered

cardiac arrest at MESC.  One instance was a patient of the current medical director, Dr.

Jay Christensen.  Based on information Dr. Kohli heard, she believes the cardiac arrest

resulted, at least in part, because of suboptimal patient evaluation resulting in an

improper anesthetic plan.

44.    In another instance, Dr. Simonson told Dr. Kohli that drawing emergency drugs for

general anesthesia procedures was wasteful.  This evinces Defendant's practice of

putting profits above quality patient care. Drawing up of commonly required emergency

medications comports with a standard of care. Seconds count in anesthesia, and having

commonly used emergency drugs ready is helpful in giving the medication rapidly and

avoiding wrong administration of drugs during an emergency situation.  Therefore, Dr.

---

[4] Preoperative assessment includes, in part, (1) getting the patient's medical history, (2) physical examination, (3) documentation of vital signs, (5) reviewing reports and old charts, (6) discussing anesthetic plan and risks with the patient, and (7) answering all of their questions.  Based on this, the anesthesiologists determines the anesthetic technique, dosage of medications, and if required, postpones the procedure for further investigation or treatment, cancels the procedure, or schedules the procedure in the hospital if a patient needs admission to the hospital.  "Several of the large-scale epidemiological studies have indicated that inadequate preoperative preparation of the patient may be a major contributory factor to the primary causes of perioperative mortality." A. Zambouri, *Preoperative Evaluation and Preparation for Anesthesia and Surgery*, 11 Hippokratia Q. Med. J. 1 (2007).

Kohli's practice of preparing the medications in advance was appropriate and ensured good care of the patient.

45.    Dr. Kohli's efforts to seek elimination or modification of policies and practices contrary to effective medical care comports with the American Medical Association's ethics principles that recognize a responsibility to seek changes in policies that are contrary to the best interests of patients.

46.    When Dr. Kohli raised concerns about this practice, and reminded Defendants of the standards for patient care and outlined the specific risks to patients of the new policy, Defendants were condescending and did nothing to address the patient care concerns or to modify the policy.

47.    Dr. Kohli asserts that Defendants' failure to address the serious concerns, and the condescending attitude was based, at least in part, on a negative view of Dr. Kohli's race, national origin, and gender, and/or in retaliation for opposing unlawful discrimination practices in the workplace.  Specifically, Defendants response to Dr. Kohli demonstrate an attitude that, as an Asian Indian female, Dr. Kohli was subservient and that she should be willing to serve them unquestioningly.  Moreover, Defendants dismissive, hostile attitude and failure to take corrective action, fostered an environment in which complaints of unlawful treatment were strongly discouraged.

48.    Dr. Kohli's assertion about Defendants' discriminatory hostility and disregard of her is supported by the fact that Defendants took affirmative steps to silence her questions and complaints about unfair treatment.

49.  After signing the agreement, Dr. Kohli became aware of other possibly unlawful activity that required some anesthesiologists to pay 10% of their income to The Group LLC to get cases or to be able to work at MESC.

50.  At a later date, Dr. Kohli learned via text from Dr. Christensen that the percentage had increased to 20%.  It appeared that people who were paying back more of their income received more cases.  This appeared to be an unlawful exploitive financial relationship or kickback scheme that was endorsed by MESC.

51.  Pursuant to the American Association of Anesthesiologists Guidelines for Ethical Practice of Anesthesiology, "anesthesiologists should not participate in exploitive financial relationships."    So, in November 2013, Dr. Kohli decided to inform administration about the possible kickbacks in writing.  Administration did not respond to her email and disregarded her without any investigation that she is aware of, and later stated, with no explanation, that the practice was legal.  They took no corrective action, again failing to investigate or provide Dr. Kohli with feedback of the findings.  This was another example of their disrespect of Dr. Kohli's by disregarding her serious concern.

52.  Since Dr. Kohli did not receive any response or support with regard to the discriminatory treatment including not listening to her concerns relating to (a) the unfair agreement, (b) suboptimal patient care, and (c) the possibly exploitive financial relationships, she approached the Board of Trustees to no avail.  Instead of investigating and taking corrective action, board member Michael Joseph asked Dr. Kohli, if she was not happy, why didn't she leave.  She replied, "I am being bullied.  I cannot speak in front of James Simonson," indicating to Mr. Joseph that reporting to higher authorities was the only

option she had to be treated with equality and to stand for patients' rights.  Then, Mr.

Joseph assured Dr. Kohli that he would discuss her concerns with Dr. Skuta and Mr.

Matthew Bown, but nothing changed.

53.     Around this time, Defendants asserted that things were going well and that Dr. Kohli was

the only person who was not happy.  Contrary to this bald assertion, things were not

going well.  As previously mentioned, nurses and staff members were being harassed.

54.     Due to Defendants' inaction to Dr. Kohli's complaints about Dr. Simonson's treatment of

her and other female employees, his harassing behavior escalated to include sexual

harassment.

55.     In around May 2014, Dr. Simonson was allowed to resign amidst rumored allegations of

sexual harassment of a female nurse.  Authorities never acknowledged the sexual

harassment, never discussed Dr. Simonson's resignation with employees, never tried to

reassure employees that sexual harassment would not be tolerated, and never took any

corrective action regarding the pervasive discriminatory environment in the workplace.

56.     Even after Dr. Simonson's resignation, the female charge nurse still felt the

discrimination and resigned.  Her resignation was celebrated as her "escape".

57.     After Dr. Simonson resigned, Dr. Kohli sent an email to administrators reasserting that

she had reported the harassment in the past, and that their inaction allowed the hostile

treatment of female employees to escalate and urging them to take corrective steps to

remedy the discriminatory environment.  Thereafter, defendants retaliated further

against Dr. Kohli.

58. Following Dr. Simonson's resignation, Dr. Christensen reached out to Dr. Kohli asking her to provide more coverage. Dr. Kohli asked to be restored to her position of handling a fair number of cases at MESC, or assured at least a part-time position for her to make this commitment. Dr. Christensen assured her at least a part-time position, and Dr. Kohli agreed.

59. Dr. Kohli was invited by Dr. Skuta to apply for the open Medical Director position.

60. Dr. Kohli applied, but her application was not given fair consideration. It became abundantly clear during the interview process that Defendants never intended to offer her the job. This was just another example of the unlawful treatment Dr. Kohli endured. Dr. Kohli asserts that Defendants only interviewed her in an attempt to pacify her or pat her on the head so that she would keep quiet and not complain. This is supported, in part, by the fact that no question was asked regarding supervision of The Group LLC, when supervision of The Group was integral to the medical director position. This was significant because the members of The Group LLC had been hostile to Dr. Kohli and discriminated against her on an ongoing basis with no corrective action taken by the administration. Also, members of The Group LLC never gave any indication that they were interested in Dr. Kohli as their leader.

61. A white male, Dr. Jay Christensen, was hired instead of Dr. Kohli who was more qualified.

62. Dr. Christensen demonstrated an inadequate knowledge of the standards of patient care for a medical director. One of his patients suffered cardiac arrest at the facility for possibly inadequate preoperative evaluation. He supported policies harmful for patient care, and engaged in and supported discriminatory conduct. After receiving the position,

there were several instances where he demonstrated poor communication skills and a poor knowledge base.

63.     He was involved in purchasing refurbished anesthesia machines which could not be checked, and he failed to communicate this to the anesthesiologists.

64.     He made the poor decision to replace a functioning anesthesia machine with a dysfunctional anesthesia machine.

65.     Defendants were also negligent in the duty to properly maintain anesthesia machines. Specifically, the machines were not checked on a regular basis as required, which further compromised patient care.  For example, over a two-month period in one operating room, the logs indicated that the machines were only checked when Dr. Kohli checked them when she worked in that room.

66.     In addition, one operating room was used with a malfunctioning anesthesia machine for three weeks, and the same room was missing an Ambu Bag, which is an essential emergency backup when an anesthesia machine fails.

67.     Dr. Kohli raised concerns about these issues with the nurse, the surgeon, the medical director, and the risk management nurse and made sure that the patient was not brought into the room until the room was checked and properly equipped.

68.     Another example of Defendant's negligence in maintaining standards of patient care includes using the wrong connection for breathing circuits.

69.     Additionally, there was an indication of inaccurate charting on at least two occasions, that warranted further investigation. Dr. Kohli was concerned because it can be a very serious issue, and she wanted those in authority to investigate.  She wanted to discuss it

with someone in a confidential manner so that it could be investigated fully. However, the discrimination and hostile environment she was experiencing made it difficult for her to discuss her concerns. She was unsure whether she would be believed and the Defendants would take action to address the problem, or she would suffer further discrimination, hostility, and retaliation.

70.    In January of 2015, Dr. Kohli learned via text from Dr. Christensen that the pay in was 20%, instead of 10%, which makes the possibly exploitive financial relationship even worse. Between July 2013 (where anesthesiologists were paying 10%) and December 2014, the only anesthesiologist to join The Group LLC, was an anesthesiologist who was on probation from the Board of Medical Licensure. This raised a concern whether the anesthesiologist on probation was being abused by asking him to pay more of his income to get work. In January of 2015, another anesthesiologist joined The Group, possibly paying 20%.

71.    At one point, Defendants indicated that the financial arrangement was legal and that the money was being paid as a buy in to The Group practice. If the arrangement was indeed legal, then why wasn't Dr. Kohli offered an opportunity to buy in to The Group practice. In that case, it was a further act of discrimination and exclusion of Dr. Kohli in spite of her qualification, experience, and excellent medical reputation. There were no female anesthesiologists in The Group, and no anesthesiologist from a different ethnic group. They were all white males as far as Dr. Kohli is aware.

72. No one in the organization took Dr. Kohli's complaints seriously because of her race, national origin, gender, and/or her prior complaints of discrimination in the workplace. They did not investigate, and they continued to endorse Dr. Christensen.

73. Because of the hostility, and the concerns she had related to patient care were serious, in or around February 2015 she approached the Anesthesia Patient Safety Foundation about her concerns and seeking advice for handling such a situation. Later, in or around April or May 2015 before her termination, she contacted the American Society of Anesthesiologists.

74. Although she was discouraged, she planned to raise the issues with Dr. Siatkowski, Vice Chair for Academic Affairs at Dean McGee Eye Institute, when she was scheduled to work with him on February 17, 2015. However, Dr. Kohli was not confident that he would take her concerns seriously about all of the issues she had noticed recently. Therefore, she did not raise the issues with him.

75. On February 17, 2015, Dr. Kohli had two patients with a common complication that was handled in a timely and adequate manner in both cases. However, Defendants used these incidents to harass her for "panicking" and calling for help.

76. Incident 1 – Dr. Kohli called for help quickly because she determined that the patient's oxygen saturation would decrease otherwise, and it did. Because of timely help, the patient's complication was resolved very quickly. She took the image of the vital signs from the monitor to document that the patient was taken care in a timely manner.

77.    In anesthesiology literature calling for help is strongly encouraged.  "Calling for help is

       not a sign of low self-confidence; it shows your respect and sense of responsibility for

       your patient's safety. 'Heroes' are dangerous.'"[5]

78.    However, she was harassed later, and her reasoned decision to call for help was labeled

       as panic.  Defendants falsely claimed that they responded to multiple calls for help from

       Dr. Kohli.  Specifically, Dr. Christensen stated "Dr Boucher has told me he has responded

       4 times with airway issues in the past yr or so, i can personally remember at least three i

       have responded to."  Even though this was only the second time she had called for help

       in the last two years since The Group LLC was formed.

79.    Dr. Kohli asked Dr. Christensen to investigate his wrongful charge, and even asked him

       to list the three instances that he responded to.  He was unable to do so, and stated "I

       cannot speak to Dr. Boucher's experiences."

80.    Incident 2 – The complication was similar to the patient in incident 1, but this patient was

       an adult.  Dr. Kohli informed the nurse about the complication in case they needed to call

       for help, but she was able to resolve the complication on her own.  Dr. Kohli had planned

       to put a laryngeal mask to provide anesthesia; however, because of the complication the

       correct action was to intubate (i.e. use a breathing tube), and that is what Dr. Kohli did.

       She used a video scope to insert the tube.  She had clear visualization of the vocal cords

       immediately after inserting the scope.  However, the endotracheal tube did not go in on

       the first pass, which is very common, but Dr. Kohli was successful on the subsequent

5 Marcus Rall, et al., *Crisis Resource Management to Improve Patient Safety*, Euroanesthesia, May 28-31, 108 (2005).

pass. The video scope was inserted only once, and there was no trauma or bleeding. It
went smoothly.

81.    The patient later reported a sore throat, which is a very common. In one study, a sore
throat was reported by 45.5% of patients with tracheal tube. It is a minor complication
that usually gets better in 48 hours and occasionally takes a little longer

82.    Without communicating or clarifying any concerns with Dr. Kohli about the patient's sore
throat, Dr. Siatkowski complained about this minor issue to the CEO, Dr. Skuta, and the
medical director, Dr. Jay Christensen. He asked Dr. Christensen to talk to the patient.

83.    Because Dr. Christensen was busy, he asked Dr. Kohli to communicate with the patient.
Dr. Kohli contacted the patient and learned that the patient did have a sore throat, but
was able to talk clearly and did not have any problems with swallowing indicating that
there was no major concern. Also Dr. Kohli did not worry because she had performed the
intubation and was confident that there was no trauma.

84.    After talking with the patient, Dr. Kohli wrote a detailed email to Dr. Siatkowski, Dr.
Skuta, and Dr. Christensen and asked to be informed if there were any further concerns
related to the patient's care.

85.    Dr. Siatkowski replied, "Thanks for talking to her."

86.    Dr. Kohli did not hear anything further, and did not know Dr. Siatkowski had asked Dr.
Christensen to continue talking with the patient. In fact, Dr. Christensen talked with the
patient four more times without informing or involving Dr. Kohli.   All further
communications with the patient were deliberately withheld from Dr. Kohli until after
she was terminated.

87.    Based on later communications with Dr. Christensen, he managed the patient's care poorly by simply asking her to wait every time he spoke with her without making any definitive plan.  The management plan changes when the complaint about the sore throat is on day two versus month two.  At month two, the patient definitely needs to be evaluated by an Ear, Nose, and Throat specialist to rule out other causes of sore throat which could be related or unrelated to anesthesia.  However, Dr. Christensen told the patient to wait four times without convincing the patient to be evaluated by an E.N.T., which is not adequate care.

88.    Dr. Christensen also contradicted his own statement.  At one point he claimed this was an issue and subsequently indicated that he did not think it was serious.   In his text communications, he said "I called her at Dr. Siatkowski's request.  I didn't realize it would've tuned into an ongoing issue . . . I don't expect anything else to come of it."  Yet, they harassed Dr. Kohli, accused her of poor care, and used the incident as a basis to terminate her.

89.    Because of the hostile environment, Dr. Kohli knew that any complication, even a minor complication as in these instances, would have a serious consequence for her.  This is supported by the incident described above.

90.    In another circumstance, Dr. Kohli was accused of under-sedating her patients and not providing enough anesthesia.  Dr. Kohli has the habit of asking almost every sedation patient whether they were comfortable during the procedure.  Almost all patients indicated that they were comfortable.  Defendants never informed Dr. Kohli of any complaints related to under-sedation until after her termination.  If their primary interest

was patient care, why was she not informed at any time during her employment so that she could give more sedation or explain to the surgeon the medical reasons for giving less sedation in certain cases.

91.    In addition to the hostility from administrators, Dr. Kohli began experiencing hostility from the other surgeons.  This was supported when she was informed after she was terminated that most of the surgeons did not want to work with her.  This was despite her good work history and her reputation as a qualified doctor.  There were no incidents of compromised patient care, negligence, or even an argument with any surgeon.  Dr. Kohli believes it was because of her race, gender, and national origin, wrong rumors were spread against her to support the discrimination and the illegitimate decision to terminate her later.

92.    Dr. Kohli was not aware that her termination was being planned.

93.    She could feel the hostility from Defendants who were not receptive to her concerns; therefore, in April or May of 2015, just prior to her termination, she contacted the American Society of Anesthesiologists (ASA). When presenting her concerns to the ASA, Dr. Kohli was careful to maintain the respect of the institution.  The ASA responded to Dr. Kohli, and she planned to schedule a meeting with the administrators to discuss her communication with the ASA.  Before she could do so, she was terminated via a telephone call from Dr. Jay Christensen on May 29, 2015.

94.    On that day, Dr. Christensen informed Dr. Kohli that he would no longer be calling her regularly for work on Mondays and Thursdays as previously promised verbally and in writing.  The reasons provided were that the surgeons did not want to work with her, Dr.

Christensen was still dealing with the complication related to the airway, and that Dr. Kohli panics. He did not provide any specifics, or give Dr. Kohli any opportunity to dispute the allegations, and the call ended.

95. Dr. Kohli contacted him again via text communication and requested the specifics of the stated reasons for the termination so that she could have an opportunity to refute the allegations, but only vague statements were provided. For example, Defendants responded via text communication and alleged, without any examples, that the "volume of complaints was excessive by any standards." During her employment, other than the single incident involving the sore throat described above, Dr. Kohli was not informed of even one incident where the surgeons complained about her. Moreover, if Defendants claim was true that there was a "volume" of complaints against her, then Defendants' failure to ever inform Dr. Kohli of these alleged complaints, while allowing her to continue treating patients demonstrated negligence on their part.

96. Dr. Kohli responded in a detailed email showing that all of the allegations were either false or indicated Dr. Christensen's inadequate knowledge to appreciate and acknowledge the good care provided by Dr. Kohli. Despite having the authority to do so, Dr. Christensen made no effort to investigate and did not address Dr. Kohli's evidence. He simply stated that he could not speak to specifics.

97. In the same communications, Dr. Kohli expressed concern about damage to her excellent professional reputation. She said "I wanted to clarify all the complaints against me so that I am respected here. I have always worked very sincerely with the best interests of the patients and the institution being in the forefront. Please let me know if you have

ever felt any negligence on my behalf."  She further stated "I am surprised that I was never informed about the complaints until our conversation last week.  I wonder why I wasn't informed earlier?"

98. In spite of being terminated, Dr. Kohli remained calm.  Without getting angry, she approached Mr. Geist, who became the new COO following Mr. Bown's resignation in or around December of 2014, about her ongoing experiences relating to harassment, the unfair agreement, suboptimal patient care, her communication with the American Society of Anesthesiologists for improving care at MESC, false allegations for termination, possibly exploitive financial relationships, and inaccurate charting.

99. Dr. Kohli prepared a file of supporting documents and reviewed those documents while discussing all of the above concerns with Mr. Geist.  Yet no response was provided regarding the harassment, the unfair agreement, suboptimal patient care, her communication with the American Society of Anesthesiologists for improving care at MESC, false allegations for termination, and inaccurate charting.  It appeared that no proper investigation was done, as stated by Mr. Geist in an email "I have asked questions without getting full details to confirm the position of MESC and the utilization of Dr. Kohli's services."  He also stated that he did not see the contract related to the financial agreements within The Group LLC.

100. Practices such as those described above demonstrate the different and less favorable treatment Dr. Kohli experienced in comparison to male and/or non-Asian Indian employees.

101.   Dr. Kohli's good practices were harassed.  While negligence, poor communication, providing care indicating poor knowledge about standards of patient care, and discriminatory and harassing acts of white, male employees were supported and endorsed as acceptable practice.  Defendants' disrespect toward female, Asian Indian, and/or older employees was allowed to persist resulting in an escalation of the hostility and an environment in which Dr. Kohli was harassed, intimidated, and defamed by false allegations that possibly influenced the surgeons not to work with her

102.   Throughout Dr. Kohli's employment, Defendants failed to discharge their duty to address her concerns.  Defendants did not appear to investigate, and they did not provide any response to support or refute her concerns.

103.   Dr. Kohli remained respectful and professional throughout her employment.  Even after her termination, Dr. Christensen sent a text message expressing thanks for her candor, and, in an email, Mr. Geist stated "I did enjoy meeting Dr. Kohli."

104.   The employer's unlawful conduct toward Dr. Kohli was so severe and/or pervasive that it created a work environment that a reasonable person would consider intimidating, hostile, and/or abusive.

105.   One or more factors motivating the decision to terminate Dr. Kohli, either separately, together, or in combination with other factors, was Dr. Kohli's race, national origin, gender, and retaliation for complaining of discrimination.

106.   Upon her termination, Dr. Kohli was replaced by a younger, white male anesthesiologist.

107.    As a direct result of MESC's discriminatory conduct, Dr. Kohli has suffered and continues to suffer irreparable harm including lost wages and emotional distress.  Dr. Kohli has also suffered injury to her professional reputation and embarrassment.

108.    Dr. Kohli exhausted her administrative remedies by timely filing a discrimination charge in or about November, 2015.  The Equal Employment Opportunity Commission issued Dr. Kohli's right to sue letter on February 9, 2017, and Dr. Kohli received such letter thereafter.  This complaint is timely filed within 90 days of Dr. Kohli's receipt of her right to sue letter.

### COUNTS I and II - DISCRIMINATION BASED ON RACE AND NATIONAL ORIGIN

For her first and second causes of action, Dr. Kohli incorporates and realleges all prior allegations as if fully set forth herein, and further alleges:

109.    As a person of Asian Indian descent, Dr. Kohli is a member of protected racial and national origin groups.

110.    She was an employee within the meaning of the Title VII.

111.    MESC, by and through its agents and employees, discriminated against Dr. Kohli based on her race and national origin in violation of Title VII with respect to the terms, conditions, and privileges of employment by, among other things, subjecting her to discrimination in the form of unfair scheduling, failing to stop complained of discrimination, denying her the medical directorship position despite her qualifications, experience, and skills because of her race and/or national origin and in retaliation for her complaints of discrimination.

112. MESC's conduct was intended to injure Dr. Kohli, and was done with conscious disregard of Patient's civil rights.

113. Race and national origin discrimination, and retaliation for Dr. Kohli's complaints of race discrimination are a violation of Title VII.

114. Under this count, Dr. Kohli is entitled to recover compensation for lost wages (past, present and future), emotional distress damages, attorney fees and costs.

115. Because the actions of the Defendants were, for the reasons described above, intentional, willful, and malicious or, at the least, in reckless disregard of the federally and state protected rights of Dr. Kohli, she is entitled to an award of punitive damages to punish the Defendant for its unlawful practices and to deter the unlawful practices in the future.

**COUNT III – DISCRIMINATION BASED ON RACE IN VIOLATION OF § 1981**

For her third cause of action, Dr. Kohli incorporates and realleges all prior allegations as if fully set forth herein, and further alleges:

116. As a person of Asian Indian descent, Dr. Kohli is a member of protected racial group.

117. MESC and The Group LLC, by and through their agents and employees, discriminated against Dr. Kohli based on her race violation of 42 U.S. § 1981 with respect to the terms, conditions, and privileges of employment by, among other things, subjecting her to discrimination in the form of, *inter alia*, failing to stop complained of discrimination, unfair scheduling, denying her the medical directorship position despite her qualifications, experience, and skills because of her race and/or national origin, and retaliating for her complaints of discrimination.

118. Defendants' conduct was intended to injure Dr. Kohli, and was done with conscious disregard of her civil rights.

119. Accordingly, Dr. Kohli is entitled to recover compensation for lost wages (past, present and future), emotional distress damages, attorney fees and costs.

120. Because Defendants' actions were, for the reasons described above, intentional, willful, and malicious or, at the least, in reckless disregard of the federally and state protected rights of Dr. Kohli, Dr. Kohli is entitled to an award of punitive damages to punish the Defendant for its unlawful practices and to deter the unlawful practices in the future.

## COUNT IV – DISCRIMINATION BASED ON GENDER

For her fourth cause of action, Dr. Kohli incorporates and realleges all prior allegations as if fully set forth herein, and further alleges:

121. As a female, Dr. Kohli is a member of a protected gender group.

122. She was an employee within the meaning of Title VII.

123. Dr. Kohli's gender was a motivating factor in MESC's discriminatory conduct and termination decision, and discrimination based on gender is contrary to and in violation of Title VII in as much as the employment decisions were based, in whole or in part, on Dr. Kohli's gender.

124. As a result of MESC's wrongful conduct, Dr. Kohli has sustained damages.

125. As such, Dr. Kohli is entitled to all relief afforded by Title VII, including back pay, attorneys' fees and costs.

126.     Further, because MESC's actions were willful, Dr. Kohli is entitled to an award of punitive damages to punish the MESC for its unlawful practices and to deter such unlawful practices in the future.

## COUNT V – RETALIATION

For her fifth cause of action, Dr. Kohli incorporates and realleges all prior allegations as if fully set forth herein, and further alleges:

127.     Dr. Kohli complained of discriminatory treatment she and others endured during her employment.

128.     Complaining of discriminatory harassment, hostility, and other wrongful conduct in the work environment is protected conduct as a matter of law.

129.     Dr. Kohli's complaints were not investigated or otherwise addresses and thereafter, she suffered retaliation including, but not limited to, termination of employment.

130.     MESC's failure to address Dr. Kohli's complaints, and its decision to terminate her employment were based on her protected conduct and, therefore, in violation of Title VII's anti-retaliation provisions.

131.     As a result of MESC's wrongful conduct, Dr. Kohli has suffered, and continues to suffer harm.  As such, she is entitled to all relief afforded by the Title VII including, back pay, front pay, compensation for emotional distress and mental anguish, injunctive relief, attorneys' fees and costs.

132.     Additionally, because MESC's actions were intentional and with malice or reckless indifference, Dr. Kohli is entitled to an award of punitive damages to punish the MESC for its unlawful practices and to deter such unlawful practices in the future.

## COUNT VI – WRONGFUL TERMINATION AGAINST OKLAHOMA PUBLIC POLICY

For her sixth cause of action, Dr. Kohli incorporates and realleges all prior allegations as if fully set forth herein, and further alleges:

133. The conduct described above constitutes a violation of Oklahoma's public policy against discrimination as set out in the Oklahoma Anti-Discrimination Act.

134. As a result of MESC's wrongful conduct, Dr. Kohli has sustained damages and is entitled to compensatory damages including, but not limited to, economic loss, attorneys' fees and costs.

135. Because MESC engaged in discriminatory practices intentionally and with malice or with reckless indifference to Dr. Kohli's protected rights, she is entitled to an award of punitive damages to punish the MESC for its unlawful practices and to deter the unlawful practices in the future.

136. Additionally, Dr. Kohli is entitled to damages for the emotional distress/dignitary harm she suffered including harm to her professional reputation, stress, anxiety, mental anguish, and like emotions.

RESPECTFULLY SUBMITTED this 9th day of May, 2017.

Tynan Grayson, OBA No. 20709
GRAYSON LAW GROUP, PLLC
4334 NW Expressway, Ste. 273
Oklahoma City, OK 73116
Telephone: (405) 283-2529
Facsimile: (405) 708-6344
Email: tynan@thegraysonlawgroup.com

ATTORNEY FOR PLAINTIFF

**JURY TRIAL DEMANDED**
**ATTORNEY LIEN CLAIMED**

## VERIFICATION

STATE OF OKLAHOMA        )
                         )     ss.
COUNTY OF OKLAHOMA       )

I, Neeti Kohli, of lawful age, being first duly sworn upon my oath, do depose and state (1) that I am the Plaintiff named above, (2) that I have read the above and foregoing Complaint and understand the contents, and (3) that the facts set forth therein are true and correct to the best of my knowledge and belief.

_____
NEETI KOHLI

Subscribed and sworn to before me this _9th_ day of ____May____, 2017.

_____
NOTARY PUBLIC

My Commission expires: ___5-18-17___

JILLIAN S HERNDON
NOTARY
CLEVELAND COUNTY
#09004314
EXP. 05/18/2017
PUBLIC
STATE OF OKLAHOMA